UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TAVONN R. JENKINS, *et al*,<br>    *Plaintiffs*,<br><br>v.<br><br>ROAD SCHOLAR TRANSPORTATION, LLC, *et al*,<br>    *Defendants*. | Civil No. 3:16-CV-554 (JBA)<br><br>January 8, 2019 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tavonn R. Jenkins, together with his minor children Tavonn R. Jenkins, Jr. and Mia Cherie Jenkins, brings this diversity action against Road Scholar Transportation, LLC, 2001 Leasing Corporation, and Joshua P. Caswell, for personal injuries suffered by Plaintiff and for his children's loss of consortium. (Second Am. Compl. ("SAC") [Doc. # 58] ¶¶ 1-8.) Plaintiff claims that Defendant Caswell acted negligently by unsafely and illegally parking his truck on the right shoulder of I-95, where Plaintiff collided with the truck and suffered serious injuries on March 8, 2014. (*Id.* ¶¶ 11-12, 16.) Defendants moved for summary judgment, ([Doc. # 90]), and for the reasons set forth below, the Court grants Defendants' Motion.

**I.    Background**

On the evening of March 7, 2014, Plaintiff drove from his home in New Haven to attend a birthday party in New York, leaving around 9 p.m. and arriving in New York approximately one hour and forty-five minutes later. (Ex. A (Pl.'s Dep.) to Defs.' Mot. Summ. J. [Doc. # 90-3] at 43, 48-50.) The party took place at a restaurant, 9A. (*Id.* at 50.) Plaintiff estimates that he left the party "around midnight or 1:00 [a.m.] . . . ." (*Id.* at 56.) After leaving 9A, Plaintiff walked to Amy Ruth's, a "chicken and waffle . . . place in Harlem." (*Id.* at 57.) Amy Ruth's was within walking distance of

9A, and Plaintiff wanted "to get some air, get some coffee, get something in [his] system[.]" (*Id.*) Plaintiff had only eaten appetizers at 9A, but stated that he had also eaten dinner at home in New Haven before driving to New York. (*Id.* at 57-58.) At his deposition, Plaintiff testified that his alcohol consumption at 9A consisted of "a couple of celebratory shots" and a single beer. (*Id.* at 58-60.) At Amy Ruth's, Plaintiff ate chicken and waffles, which he described as a "sobering up method." (*Id.* at 61.) Plaintiff stayed at Amy Ruth's for no more than forty-five minutes. (*Id.*) Plaintiff drank coffee on his walk back to his car, which was parked at 9A. (*Id.* at 62.) Plaintiff left New York around 3 a.m., and the collision occurred at 3:49 a.m. (*Id.* at 98-99.)

Plaintiff intended to drive directly to his home in New Haven from 9A, taking I-95, a drive that he had made many times before. (*Id.* at 64.) Before the collison, Plaintiff stopped only to pay the toll. (*Id.* at 65.) According to Plaintiff, prior to the collison, he was driving around 50-55 miles per hour in the middle of three lanes in Greenwich, Connecticut. (*Id.* at 66.) Plaintiff testified that as he passed a truck weigh station on his right, he "hit a patch of ice or something, some slippery condition on the ground," which he "assumed was black ice because [he] couldn't see it[.]" (*Id.* at 68-69.) Upon hitting the ice, Plaintiff testified that he "began to slide to the right through one lane past the breakdown lane." (*Id.* at 69.) Upon entering the breakdown lane but before hitting the truck, the right side of Plaintiff's car made contact with an ice bank piled to the right of the breakdown lane, staying in contact with that ice for 82 feet until he collided with the parked truck. (*Id.* at 69, 74.)

According to Plaintiff, when he hit the ice patch in the middle lane, he did not spin, but instead slid to the right. (*Id.* at 92.) The car did not rotate and remained facing forward in the direction of traffic, but crossed over from the middle lane to the right travel lane, through the acceleration lane (leading out of the weigh station), and into the shoulder. (*Id.* at 93-94.)

According to Plaintiff's medical records, Plaintiff told staff that he believed he lost consciousness and that he had seven drinks before the collison. ([Doc. # 90-9] at 2.) The records state that Plaintiff "is currently intoxicated" and "smells of alcohol." (*Id.*) While the records do not clearly specify at what time those observations were made, they do note that Plaintiff had to be extricated from the car over the course of 2 hours. (*Id.*) At his deposition, Plaintiff maintained that he was awake throughout this entire episode and denied recalling that he had told a responding state trooper and Stamford Hospital staff that he had fallen asleep at the wheel. (Pl.'s Dep. at 74-75.) When asked whether he recalled telling hospital staff that he had had seven drinks, Plaintiff testified that he did not remember speaking with the staff at all. (*Id.* at 99.)

Plaintiff recalls that the weather was cold on the night of the collison, but he did not have any other traction issues on the way to New York or on the return trip until the collison. (*Id.* at 96.) Plaintiff did not see any other vehicles spin out or lose control on the highway. (*Id.*) Deputy Chief Keith Millette of the Greenwich Fire Department, who responded to the crash, approached from the same direction as had Plaintiff and states in his affidavit that he had "no recollection of having difficulties with traction, or encountering any problems with ice on the roadway." ([Doc. # 90-12] at 2-3.) Millette arrived at the scene at 4:03:55 a.m. (*Id.* at 3.) Over course of the 3-hour call, from approximately 4:00 to 7:00 a.m., Millette had "no recollection of having had any difficulties with ice[,]" and the only ice he saw was in the snowbank on the side of the road. (*Id.* at 3-4.) Millette noted that "[t]here was nothing compelling about the surface of the road or shoulder, one way or the other" and that he did "not remember any Fire Department personnel having difficulty with their footing." (*Id.* at 4.)

Similarly, in the unrebutted report of Brad Field, Chief Meteorologist of New England Skywatch Weather, Field concludes, based on the absence of precipitation in the location of the

3

crash, and the lack of "evidence of enough [snowbank] melting to flood into the northbound travel lane and freeze over[,]" that it is "highly likely that the travel lane would have been dry and ice-free." ([Doc. # 90-13] at 5.)

In support of their Motion for Summary Judgment, Defendants also rely upon the unrebutted expert toxicology report of Dr. Charles McKay. ([Doc. # 90-11].) In his report, Dr. McKay lays out the basis and methodology by which he reverse-extrapolates Plaintiff's approximate blood-alcohol concentration ("BAC") at the time of the crash. (*Id.* at 3-4, 6.) Dr. McKay notes that "[t]he BAC equivalent of 0.093g% was drawn from Mr. Jenkins 3 hours and 21 minutes after the crash, with his last drink stated to have been consumed more than 2 hours before that." (*Id.* at 3.) According to Dr. McKay's calculations, Plaintiff's "BAC at the time of the crash would have most likely been >0.15g% (with a possible range of 0.12 – 0.19g%)." (*Id.*) Accordingly, Dr. McKay concludes that Plaintiff "was legally intoxicated while driving on the highway in the early morning hours of March 8, 2014." (*Id.* at 5.) "His [reverse-extrapolated] BAC at the time of the crash . . . represented nearly 4 standard drinks of alcohol in his system at that time, and most likely required the consumption of more than 13 standard drinks over that evening and night to achieve." (*Id.*)

On the night of the crash, Connecticut State Trooper David Tharas was assigned to patrol I-95 north and south between the New York border and Exit 10. (Ex. C (Tharas Dep.) to Defs.' Mot. Summ. J. [Doc. # 90-5] at 12.) Tharas was dispatched to the scene, where he remained from approximately 4:00 until 7:00 a.m. (*Id.* at 20, 23.) Tharas had no issues with ice on the roadway that night and testified that the roads were clear. (*Id.* at 23-24.) Tharas stated that he knew Plaintiff had been drinking because he "smelled it on him." (*Id.* at 29-30.) Moreover, according to Tharas, Plaintiff's "eyes were bloodshot and glassy" and his speech was slurred. (*Id.* at 35.)

4

Tharas asked Plaintiff what had happened, and Plaintiff told him that he had fallen asleep. (*Id.* at 37.) Plaintiff made no mention of having hit ice on the roadway. (*Id.* at 37-38.) Tharas found, in his report, that the two contributing factors to the crash were (1) Joshua Caswell illegally parking in the breakdown lane and (2) Plaintiff's operation of his car under the influence of alcohol. (*Id.* at 59-60.)

## II. Defendants' Motion for Summary Judgment

### A. Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

### B. Comparative Negligence

Defendants assert that summary judgment should be granted in their favor on all counts for three independent reasons: (1) "the undisputed facts confirm the defendants did not owe a legal

5

duty to the plaintiff, because under the specific facts presented, the plaintiff's intoxicated, negligent operation of his motor vehicle was not reasonably foreseeable to the defendants, as a matter of law"; (2) even if "a duty was owed and breached, the egregious conduct of Tavonn Jenkins *himself* severs any causal connection between the defendants' conduct and this accident"; and (3) even if Defendants were negligent, "such negligence was so slight in comparison to that of the plaintiff that the plaintiff is barred from recovery as a matter of law by operation of CONN. GEN. STAT. 52-572h." (Mem. Law Supp. Defs.' Mot. Summ. J. [Doc. # 90-1] at 1-2.) Put otherwise with respect to (3), Defendants argue that "no reasonable jury could ever find that the negligence of the plaintiff did not exceed any negligence on the part of the defendants." (*Id.* at 2.)

Connecticut's negligence statute provides that "[i]n causes of action based on negligence, contributory negligence shall not bar recovery in an action by any person . . . if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought . . . ." Conn. Gen. Stat. § 52-572h(b). Conversely, and by implication, if a plaintiff's negligence *was* greater than the negligence of the defendant(s), recovery is barred.

While "[o]rdinarily, questions of negligence, contributory negligence and proximate cause are questions of fact for a jury . . . the conduct of the parties may be such that a court is justified in making a determination of the questions as a matter of law." *Kline v. New York, N. H. & H. R. Co.*, 160 Conn. 187, 189 (1970). " 'Contributory negligence becomes a question of law only when the conduct of the person under investigation is so manifestly contrary to that of a reasonably prudent person similarly situated that the mind of a fair and reasonable person could reach but one conclusion.' " *Clennon v. Hometown Buffet, Inc.*, 84 Conn. App. 182, 189 (2004) (quoting *Greene v. DiFazio*, 148 Conn. 419, 425, 171 A.2d 411 (1961).).

Here, the unrebutted expert toxicology report of Dr. McKay concludes that Plaintiff was legally intoxicated when the collision occurred, notwithstanding Plaintiff's denial of the same in his deposition. Plaintiff's bare assertion that he only consumed three drinks and thus was not intoxicated could not be credited by a reasonable jury where the expert report concludes that he had likely consumed *thirteen* drinks, where Plaintiff himself told both the responding officer and hospital staff that he had fallen asleep, where Plaintiff told hospital staff that he had consumed seven drinks, where both the responding officer and hospital staff contemporaneously believed Plaintiff to be intoxicated based on his behavior and the smell of alcohol, and where Plaintiff's BAC was found to be over the legal limit in a blood draw that occurred, at a minimum, 2 hours after the collision.

A plaintiff's deposition testimony need not be credited by the Court in the context of summary judgment where the testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (internal quotation marks and citation omitted).

Similarly, Plaintiff's testimony that he hit a patch of black ice lacks corroboration elsewhere in the record, and is substantially undermined by (1) the anticipated testimony of two different responders to the scene—Deputy Chief Millette of the Greenwich Fire Department and Trooper Tharas—both of whom drove and walked around the scene and observed no icy conditions, (2) Plaintiff's failure to mention having hit ice to Tharas at the scene, and (3) the unrebutted report of meteorologist Brad Field, concluding that it was "highly likely that the travel lane would have been dry and ice-free."

7

While Defendant Caswell is not free from blame in this horrific accident, as seen in his violation of a highway safety statute and the conclusion of Trooper Tharas that Caswell's illegal parking was a contributing factor in the crash, Plaintiff appears to have been driving while intoxicated at significantly above the legal limit, putting himself and the public at far greater risk than did Caswell.

"Negligence occurs where one under a duty to exercise a certain degree of care to avoid injury to others fails to do so." *Bennett v. Connecticut Hospice, Inc.*, 56 Conn. App. 134, 137 (1999) (internal quotation marks and citation omitted). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Id.*

Even if the Court were to assume, without deciding, that Caswell breached a duty owed to Plaintiff and that Caswell caused Plaintiff's injuries, Caswell's alleged negligence in parking illegally on the shoulder does not come anywhere close to the Plaintiff's negligence where—as here—a reasonable jury would be compelled to find that Plaintiff drove on I-95 with a BAC substantially above the legal limit. Plaintiff does not appear to contend otherwise, instead hanging his hat on his factual narrative and insisting that he was not intoxicated. But for the reasons described above, including not just a lack of corroboration but also overwhelming evidence that is directly contrary to Plaintiff's testimony, Plaintiff's testimony could not be credited by a reasonable jury, and Defendants' Motion for Summary Judgment must be granted. As all of Plaintiff's claims sound in negligence, all counts are hereby dismissed. Because the Court finds that Plaintiff's action is barred due to his comparative negligence, the Court declines to reach the other grounds raised by Defendants.

### III. Conclusion

For the reasons set forth above, the Court GRANTS Defendants' Motion for Summary Judgment. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/
_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of January 2019.